**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

**UNITED STATES OF AMERICA,**

           **Plaintiff(s),**         **CASE NUMBER: 06-20185
HONORABLE VICTORIA A. ROBERTS**

**v.**

**MARCUS LAMONT FREEMAN,**

           **Defendant(s).**

                                              /

**ORDER**

**I.    BACKGROUND AND PROCEDURAL HISTORY**

This matter is before the Court on the Government's "Motion to Enforce Order Granting Motion in Limine to Exclude Evidence of the Murder Victim, Leonard Day's, Criminal History." (Doc. # 457). Defendants Michael Bracey, Marcus Freeman and Alvino Cornelius filed responses to the Government's motion. (Doc. #s 482, 485, and 491). Roy West and Alseddrick West joined in all three responses and Cornelius joined in the responses of Bracey and Freeman. Oral argument was heard on October 4, 2010.

On July 8, 2009, the Court entered an Order concerning the admissibility of evidence of Day's criminal history. (Doc. # 325). The Court stated that at trial, Defendants were not permitted to introduce evidence of Day's criminal conduct beginning September 23, 2005 in order to prove that an unknown third party killed Day. (*Id.* at 15-16). Specifically, the Court held that Defendants could not introduce evidence

1

that Day murdered two people and attempted to murder another, nor could they introduce evidence that Day was robbed at the C Note Lounge on December 17, 2005, three days prior to his murder. (*Id.* at 8-9). This was because Defendants could not point to a specific third person who had the motive, opportunity and ability to kill Day, nor could they show a sufficient nexus between Day's murder and a third party perpetrator. (*Id.*).

The Government moves to enforce the Court's July 8 Order. The Government says that Defendants intend to play audio recordings at trial which refer to evidence the Court previously ruled was inadmissible. The Government says it would violate this Court's prior Order if the tapes are allowed and Defendants are able to attack Day's character by suggesting that a number of unidentified people may have wanted him dead. Also, the Government specifically objects to evidence that Day was wanted for murder and attempted murder.

In response to the Government's motion, Defendants argue: (1) there is now enough evidence to support his third party culpability defense, such that evidence of the C Note Lounge robbery, and the circumstances surrounding it, are admissible and (2) evidence of Day's criminal conduct is relevant and admissible for reasons not addressed in the Court's July 8 Order. (Doc. # 485). Namely, Defendants argue that the recordings they intend to introduce, reveal that they armed themselves and planned to confront Day, not because they wanted to kill him, but because they wanted to recover the money and jewelry he stole from West, and they believed they needed weapons to protect themselves against Day. Defendants also say this evidence is necessary background information about Day's homicide investigation, and to put Defendants'

conversations about Day into proper context under the rule of completeness.

Cornelius makes similar arguments, but also states that evidence of Day's specific prior bad acts is admissible to explain to the jury the nature of the relationship between Cornelius and Day and the actions and intent of Cornelius in bringing Day to West's home and in making some of the inculpating statements he made to West after Day stole West's money and jewelry. At the hearing on the motion, Cornelius also argued that the jury needed to hear that Day was wanted by police for murder and attempted murder so that they would understand why the police went to extreme lengths to locate Day in November 2005. Without this information, Cornelius contends, the jury will be left with the false impression that the police were searching for Day in order to protect him from Defendants.

The Government says that it does not object to the introduction of evidence showing that Defendants knew Day to be a violent person, nor does it object to the introduction of evidence that the police had a warrant for Day's arrest, and were looking for him, when he left Detroit for West's home in Ohio. The Government objects, however, to evidence that the warrant was issued because Day allegedly murdered two people and attempted to murder a third, by slitting his throat. The Government argues that this evidence is inadmissible under the rules of evidence and that its probative value for the defense is minimal and outweighed by the prejudice it would create. The Government contends that the evidence shows that police went to extreme lengths to find Day precisely because they wanted to protect him, based on the information obtained from the Title III wiretaps. The Government also objects to the introduction of specific facts surrounding the C Note Lounge incident, arguing that the robbery is too

3

attenuated from Day's murder to form the basis of a third party culpability defense. The Government does not object to the introduction of audio recordings where the parties discuss the fact that Day was robbed.

The Government's motion is **GRANTED IN PART AND DENIED IN PART.**

## II. ARGUMENTS AND ANALYSIS

### A. Meaningful Opportunity to Present Defense

On July 8, 2009, the Court ruled that if Defendants could "(1) point to a specific person who had the motive, opportunity, and ability to kill Day; and (2) produce sufficient evidence to show a nexus between Day's murder and the alternative perpetrator," evidence of the C Note Lounge robbery and Day's criminal conduct, beginning September 23, 2005, pursuant to their constitutional right to a meaningful opportunity to present a defense, would be admissible. (Doc. # 325 at 8).

Defendants assert that, following fourteen months of discovery, there now exists a nexus between a third party and Day's murder. They proffer additional facts to argue that the circumstances surrounding the C Note Lounge robbery are admissible to show that someone other than Defendants murdered Day. Defendants say that (1) while Day was in the parking lot of the lounge, a man fired a gun at Day and stole the necklace he was wearing; (2) Day believed the robber tried to kill him; (3) Day attempted to arm himself after the robbery and threatened to kill the robber; (4) when police questioned witnesses to the robbery, about whether Day was having problems with anyone, they mentioned the C Note Lounge incident; (5) police officers investigating the murder also investigated the robbery; (6) a description of the robber given by one witness is similar

to Day's description of the person who shot and ultimately killed him (who he said was West); and (7) Day was being followed to his house by unknown people. (Doc. #485, at p. 3).

"[F]undamental standards of relevancy require the admission of [evidence] which tends to prove that a person other than the defendant committed the crime that is charged." *United States v. Crosby*, 75 F.3d 1343, 1347 (9th Cir. 1996) (quoting *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980)). However, "evidence of third party culpability is not admissible unless there is substantial evidence directly connecting that person with the offense." *Andrews v. Stegall*, 2001 WL 303525, \*\*1 (6th Cir. March 16, 2001). Courts considering the admissibility of third party guilt evidence must evaluate whether the proffered evidence establishes that someone other than the defendant had the "opportunity, ability and motive to commit the crime." *Crosby*, 75 F.3d at 1347.

The Court finds that with this additional factual proffer, Defendants provide "substantial evidence directly connecting [a third party] with [Day's murder]." *Id.* The proffer is probative of Defendants' theory that a third party, namely, the person who robbed Day, committed the offense.

Citing *Wade v. Mantello*, 333 F.3d 51, 60-61 (2nd Cir. 2003), the Government argues, there is an insufficient nexus between the C Note Lounge robbery and Day's murder. The Court disagrees. Evidence that three days prior to Day's murder, another individual not only robbed Day, but shot at him, could cause a jury to doubt Freeman's guilt. "If the evidence that someone else committed the crime is in truth calculated to cause the jury to doubt, [this Court must] not attempt to decide for the jury that this

doubt is purely speculative and fantastic [,] but should afford the accused every opportunity to create that doubt." *United States v. Stever*, 603 F.3d 747, 753 (9th Cir. 2010); *see also Wade*, 333 F.3d at 58-59 ("[I]n determining whether the exclusion of defense evidence violate[s] [a criminal defendant's right to present a complete defense,] we have previously considered...the determinative question to be whether the omitted evidence would have created a reasonable doubt."). Also, the Supreme Court stated that " 'at a minimum, [ ] criminal defendants have the right...to put before a jury evidence that might influence the determination of guilt.'" *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). Further, "[t]he Supreme Court has found unconstitutional the rigid application of state evidentiary rules prohibiting presentation of defense evidence of third-party culpability." *Wade*, 333 F.3d at 57.

While the mere showing of animus by a third party towards the victim, standing alone, does not establish that the third party committed the crime, Defendants present more. The robber was aware of Day's location just three days prior to his murder, had a weapon and the apparent ability to kill Day, and may have attempted to do just that. Moreover, the robbery occurred just several miles from the street on which Day was shot and killed.

The Government argues that the temporal proximity of the robbery to the murder does not advance Defendants' argument. (Doc. # 501, at p. 10). Temporal proximity alone may not be enough to establish a direct connection between the robbery and murder. However, more is presented here. There is evidence that the robber: (1) used the same type of weapon that was used in Day's murder; (2) shot at Day; (3) caused

Day to believe the robber wanted to kill him; and (4) was in the general area of Day's murder three days prior to the murder. Further, witnesses to the robbery identified the perpetrator as someone Day was having problems with; and, that witnesses gave a description of the robber that fit Day's description of the person who shot and ultimately killed him. This evidence, combined with temporal proximity, may establish a nexus between the robbery and Day's murder.

In *Wade*, the Second Circuit found the temporal connection between the prior shoot-out the victim was involved in with a third-party gang member, and the victim's murder, attenuated. It noted that the shoot-out, which happened three to four weeks prior to the murder, occurred "well before the murder." 333 F.3d at 55, 61. The court also noted that no details about the shoot-out were offered to the trial court. *Id.* at 61. Here, the prior incident occurred closer in time to the murder than in *Wade*, and Freeman offers details about the robbery, outlined above, which establish the link missing in *Wade.* The Court also notes that the district judge who reviewed Wade's habeas petition would have allowed the evidence in at trial. And, the three judge Appellate Panel split 2-1 against the admission of the evidence.

Finally, the Court notes that although Defendants are required to point to a *particular* third-party with the motive, opportunity and ability to murder Day, that person does not have to be known to, or identified by, Defendants. *See e.g.*, *Stever*, 603 F.3d at 753 ("[T]he Government argues that evidence must relate to a particular Mexican [Drug Trafficking Organization ("DTO")] to be probative of Stever's innocence. This argument fails. Evidence that makes it more likely that a Mexican DTO--any Mexican DTO--was responsible for this operation [,] makes it less likely that Stever was."); *Bryant*

*v. Comm'r of Corr.*, 964 A.2d 1186, 1197 n. 9 (Conn. 2009) ("There is no requirement that the petitioner specifically name the alleged third party perpetrator.").

In addition to the conversations where West and Cornelius discuss the robbery, which the Government does not object to, (e.g., Doc. #501, Exh. A, RW 11390-11392, 11398), Defendants are permitted to introduce evidence that the robber shot at Day, and that Day believed that the robber "tr[ied] to do him in." (Doc. # 457, Exh. B, Session #10746). Day's belief that an unidentified third-party tried to kill him, three days prior to the murder, is probative of Defendants' theory that someone else murdered Day.

**B.    Day's Violent Past**

**1.    Alleged Murder and Attempted Murder and Other Specific Acts Evidence**

Defendants argue that evidence that Day murdered two people, and attempted to murder another by slicing his throat, is admissible for several reasons not addressed in the Court's previous order. (Doc. # 485, at p. 5). First, they contend that the evidence is admissible to show Defendants' state of mind, i.e., that they took certain steps, such as hiding guns and bullet-proof vests in the Pontchartrain Hotel on November 12, 2005, to protect themselves when they confronted Day about the stolen money and jewelry. Defendants stated at the motion hearing that they intend to introduce this evidence through the testimony of a detective knowledgeable about the investigation of the alleged murders and attempt; as well through a "Wanted" ad, indicating that Day was wanted for murder and attempted murder.

While criminal defendants have a constitutional right to a meaningful opportunity to present a complete defense, "[i]t is well settled that the Constitution does not

guarantee a defendant the opportunity to present *any* evidence he desires." *Alley v. Bell*, 307 F.3d 380, 396 (6th Cir. 2002) (emphasis in original). A criminal defendant's right to present a defense is subject to reasonable restrictions and "the right must 'bow to accommodate other legitimate interests in the criminal trial process.'" *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

Defendants say they do not seek to admit evidence of Day's alleged violent crimes to show that Day acted in conformity with his past, or more generally, to show that Day was a bad person. Defendants argue that they seek to introduce this evidence to show that Defendants' perceived Day as an extremely violent and dangerous person who might harm them if they did not take steps to protect themselves. The Government responds that this is still a "backdoor attempt at character assassination of Day." (Doc. # 501, at p. 6); *see, e.g.*, *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991) ("The government cannot, [ ], in its case-in-chief, introduce evidence of Appellant's unsavory character merely to show that he is a bad person and thus more likely to have committed the crime.").

Defendants' state of mind, at the time that contested statements were made and actions in issue taken, is relevant to their theory that they lacked intent to kill Day and, instead, were attempting to protect themselves.  However, the Government points out in its Reply Brief, that the inculpating conversations and actions that Defendants attempt to justify with evidence that Day killed two people and attempted to kill a third, occurred prior to the time that Defendants learned that Day allegedly committed these acts.

The Government says evidence that Day allegedly murdered two people and

attempted to murder a third, shortly before his death on December 20, is irrelevant to Defendants' state of mind on November 12, when their guns and bullet-proof vests were discovered; they did not know about these allegations against Day on November 12. As the Government points out, Cornelius told West about the allegations on November 17, 2005. (Doc. # 501, Exh. B, at pp. 1-5). Moreover, West responded with disbelief, saying "[y]ou bullshitting," after hearing the news. (*Id.* at p. 2). Likewise, on November 11, 2005, Cornelius mentioned that the police were looking for Day, but stated, "for what I don't know." (Id. Exh. A, at ecf p. 3). On November 11, West also had a conversation with Michael Bracey. (Doc. # 501, at ecf p. 4). West told Bracey that police were looking for Day in Michigan, which is why he went to Ohio. West stated, "[t]hey tryin' to say like he robbed somebody and killed somebody or somethin'." Bracey responded, "That n***er ain't done nothin' man.... That n***er ain't been doin' nothin' but hittin' little ho ass licks man." This shows that on November 11, at least some of the Defendants did not perceive Day to be the type of person who would rob and murder someone. Thus, evidence of the alleged murders and attempted murder, does not establish that on November 12, Defendants armed themselves with guns and bullet-proof vests because they believed Day would try to kill them.

That Day allegedly murdered two people and slit the throat of another person could have "explain[ed] the Defendants' conversations" (Doc. # 485, at p. 8), only if those conversations about Day's history revealed that Defendants were aware of this history prior to the conversations they now seek to explain. The facts show that Defendants were not. The Government provides examples of several incriminating conversations involving Defendants' plan to arm themselves to confront Day, and all of

10

these conversations occurred between November 10 and November 15, prior to the date on which Defendants learned of the murder and attempted murder allegations. (Doc. # 501, at pp. 1-5).

The Court is not persuaded by Cornelius' argument at the motion hearing that the jury must know that police were searching for Day because of the murders and attempted murder allegedly committed by Day, to understand why police took extreme steps to locate him. Cornelius is still able to argue that police had a strong desire to locate Day because they had a warrant for his arrest. However, the Government has evidence suggesting that the police took extreme steps to locate Day precisely for the reason that Defendants would like to keep from the jury. The Government can argue that the police intercepted cellular phone conversations inculpating Defendants in a conspiracy to murder Day, and the police wanted to protect Day. The Court is also not persuaded by Cornelius' argument that the jury could conclude that Cornelius knew Day was wanted for murder and attempted murder when Cornelius took Day to Ohio. On November 11, Cornelius specifically said that he did not know why Day was wanted by the police, and Cornelius provides no evidence tending to show that he lied about this. Cornelius is still able to make the argument that he took Day to Ohio, because police were searching for him in Detroit for crimes allegedly committed.

Likewise, the rule of completeness does not warrant introduction of Day's specific alleged crimes. The Court is not convinced that the jury needs to learn the nature of the crimes in order to gain a full understanding of the tapes the Government intends to play. Much of the evidence the Defendants seek to introduce is admissible and not objected to by the Government. The only redactions required are to remove the names and

11

descriptions of the alleged crimes.

Moreover, the Court notes that the evidence of Day's violent past can be introduced in the form of reputation and opinion evidence only, not evidence of specific instances of conduct. See FED. R. EVID. 405 (a). The Advisory Committee notes state, "evidence of specific instances of conduct...possesses the greatest capacity to arouse prejudice, to confuse, to surprise, and to consume time." Defendants attempt to use Day's bad character, circumstantially, to show that Defendants did not conspire to kill him. Thus, this bad character evidence must come in, in the form of reputation or opinion. The government does not object to evidence that Defendants' believed that Day was dangerous and would shoot them if they confronted him. The Government's only objection is to evidence that Day allegedly murdered two people and attempted to murder a third person. Thus, as described more fully below, Defendants' opinion evidence, that Day was a dangerous person, likely to shoot them if confronted, is admissible.

Evidence that Day threatened to kill the person who robbed him is also inadmissible. This evidence comes in the form of a conversation between West and Cornelius on December 18, 2005, long after Defendants made the incriminating statements that they would attempt to explain with evidence of this bad act. For the same reason, Cornelius's comments to West on November 29, 2005, that Day was "acting crazy," like everyone was out to get him, that he "ain't got shit to lose," and that he was going to kill "Peanut," are inadmissible. (Doc. # 501, Exh. B at p. 10-11). This conversation occurred long after the incriminating conversations were made, and inculpatory conduct was committed.

Therefore, evidence of: the alleged two murders and attempted murder; Day's plan to kill the robbery perpetrator; and Day's conduct and threats to kill "Peanut" elicited on November 29, is inadmissible; it is irrelevant. See FED. R. EVID. 402 ("Evidence which is not relevant is not admissible."). This evidence is irrelevant. Since Defendants were unaware of Day's conduct, that conduct could not have had an impact on their then-existing state of mind. *See*, *e.g.*, *United States v. Penney*, 576 F.3d 297, 314 (6th Cir. 2009) ("We find dubious the proposition that a statement made months after the fact and after [Appellant] became aware of the charges against him was relevant to establishing [Appellant's] intent at the time of the offense."); *People v. Harris*, 588 N.W.2d 680, 684 (Mich. 1998) ("The purpose of [the evidence offered by the defendant] is to show the defendant's state of mind; therefore, it is obvious that the victim's character, as affecting the defendant's apprehensions, must have become known to him, otherwise it is irrelevant.").

### 2. Defendants' General Perception of Day's Disposition

In its Reply Brief, the Government states that it does not object to admission of evidence to establish that Defendants perceived Day to be dangerous, other than the specific conduct evidence outlined above. The Government also does not object to admission of evidence that Day had possession of West's firearm. (Doc. # 501, at p. 6). The Government does not object to Cornelius's statement, made on November 11, 2005, that Day is "a n\*\*\*er who will try to shoot." (Id. at Exh. A, Session #3494). The statements identified on page 5 of Freeman's Brief in Opposition, indicating that West believed that Day would have shot him if he had caught Day leaving his house with the money and jewelry, are also admissible to show that Defendants' perceived Day to be

13

dangerous and believed they would need protection from him in case of a confrontation. Finally, the Government said at the hearing on the motion, that it does not object to introduction of evidence that police had a warrant for Day's arrest, prior to his murder. There may be other evidence Defendants seek to admit not specifically addressed in this Order, which demonstrates their perception of Day as a dangerous person who would do harm to them. As a general proposition, such evidence will be admissible to show their subjective belief of a reasonable apprehension that Day would do them harm.

### III. CONCLUSION

The Government's Motion is **GRANTED IN PART AND DENIED IN PART**. Evidence that Day was robbed, and shot at, by an unidentified person, three day prior to his murder, is admissible third party culpability evidence. Evidence of Day's specific violent conduct, including the alleged two murders and one attempted murder; Day's "crazy" demeanor in late November 2005; and his threats to kill the robbery perpetrator and a person nicknamed "Peanut," is inadmissible; it is irrelevant and would do little more than paint Day in a bad light in the eyes of the jury. Finally, evidence that Defendants perceived Day as dangerous when they made certain statements in early November, and knew that he had stolen West's gun, is admissible. This is relevant state of mind evidence.

**IT IS ORDERED.**

                                              s/Victoria A. Roberts
                                              Victoria A. Roberts
                                              United States District Judge

Dated: October 4, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on October 4, 2010.

s/Linda Vertriest
Deputy Clerk